IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEPHEN LAMBERT,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

No. C 11-725 MMC

**MEMORANDUM OF DECISION; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this action, plaintiff Stephen Lambert alleges he was injured due to defendant United States of America's negligence in operating a vessel.

Between January 22, 2013 and February 4, 2013, the Court conducted a nine-day bench trial on plaintiff's claims against defendant.[1]  Cory A. Birnberg of Birnberg & Associates appeared on behalf of plaintiff.  Vickey Lee Quinn of the United States Department of Justice appeared on behalf of defendant.  Having considered the evidence presented and the arguments of counsel, the Court finds and rules as follows.

## BACKGROUND

The instant action was brought after plaintiff sustained injuries aboard the SS Capella ("Capella"), a ship operated by a private ship operator, Maersk Line, Ltd. ("Maersk"), on behalf of the United States Maritime Administration ("Marad").  Plaintiff is an

---

[1] On October 28, 2011, plaintiff waived his request for a jury trial.  (See Pl.'s Conditional Waiver of Jury Trial, filed Oct. 28, 2011.)

experienced ship repair contractor who, at the time of the accident, was employed as a manager and estimator by Vigor Marine, a maritime repair company. On December 29, 2009, plaintiff boarded the Capella in response to a Request for Quote[2] on a damaged exhaust expansion joint. (See Pl.'s Ex. 3.) The purpose of plaintiff's visit to the ship was to perform a "ship check," in other words, to examine the expansion joint in order to submit a competitive bid with respect to its repair.

The expansion joint is located on the second level of cargo hold six, which hold is three decks deep. The cargo hold has no fixed lighting and was almost completely dark on the day of the accident. Around the perimeter of the cargo hold at the level of the second deck are stringers, horizontal structural supports. The stringers are used as walkways and are accessed by ladderwells, holes cut into the stringers with ladders leading to other levels of the ship. Along the port and starboard sides, the stringers span the length of the hold, with rails separating them from the expanse of the hold. When the hold is empty, a person standing on the stringer can look out at the expanse of the hold.

On the day of the accident at issue, the hold contained three levels of flat racks. Flat racks are L-shaped structures that sit inside the hold and are stacked one upon the other. The horizontal part of each flat rack holds cargo during shipping and sits on the vertical part of the flat rack below it. The bottom flat rack sits directly on the bottom of the hold. The vertical part of each flat rack fits flush against the stringers and creates a wall running along the railing of stringer. Thus, when the flat racks are in place, a person walking on the stringer will be in an enclosed walkway, with the bulkhead on one side and the vertical part of the flat racks essentially forming a wall on the other. At the forward and aft ends of the hold, the stringer is exposed, allowing the ship's crew to access the cargo when the flat racks are in place. For structural reasons, the flat racks are designed so as to not abut the stringers at the forward and aft ends of the hold, thereby creating a gap.

---

[2] A request for quote is a document, in this instance issued by Maersk, that sets forth the work required, e.g., to repair a damaged portion of the ship, and solicits bids from companies who wish to perform the work.

The request for quote issued by Maersk for the repair of the expansion joint described the work required as cutting out the expansion joint, moving it to the ladderwell on the second level of the hold, cutting out the steel around the ladderwell so that the expansion joint could be lowered through the opening to the bottom level of the hold, then moving it onto the flat racks and preparing it for the ship's crew to hoist out of the hold using the ship's crane. The expansion joint is located forward, at the dead end of the enclosed walkway created by the flat racks and stringer on the second level of the hold. At the other end of the stringer is another dead end, with the bulkhead on one side and a grab rail[3] on the other, which rail separates the walkway from the gap at the aft end of the cargo hold. The subject accident occurred when plaintiff fell between the stringer at the aft end of the cargo hold and the flat racks. At the point where the fall occurred, the gap was twenty-nine inches in width, with a sixteen-foot drop to the level below. Plaintiff sustained a number of serious injuries as a result of the fall.

In his complaint, filed February 16, 2011, plaintiff alleges the accident and injuries caused thereby were due to defendant's negligence, and asserts a cause of action for negligence pursuant to 33 U.S.C. § 905(b) (the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA")).[4]

//
//
//
//

---

[3] A grab rail is a single-bar railing used by seamen to help steady themselves while working in heavy seas.

[4] Plaintiff's complaint additionally alleges a second cause of action, "Negligence under General Maritime Law," and a third cause of action, "Unseaworthiness." On October 28, 2011, plaintiff dismissed the third cause of action (see Doc. No. 40, filed Oct. 28, 2011), and, because both parties agree the LHWCA applies to plaintiff's claims, the Court does not address liability under general maritime law, see Chandris, Inc. v. Latsis, 515 U.S. 347, 356 (1995) (noting persons not covered by LHWCA or Jones Act may bring cause of action under general maritime tort principles).

3

**DISCUSSION**

**I. Liability**

    **A. Defendant's Duty of Care**

Plaintiff brings this suit under the LHWCA. Although, as discussed below, the LHWCA provides a private right of action, it does not waive the government's sovereign immunity from suit. Rather the government's immunity in the instant action is waived by § 31102 of the Public Vessels Act ("PVA"), which provides that a civil action may be brought against the United States for "damages caused by a public vessel of the United States." See 46 U.S.C. § 31102. Here, during the course of the trial, the parties agreed the Capella is a public vessel and that the PVA thus applies to the instant action.

The LHWCA provides to "person[s] engaged in maritime employment," see 33 U.S.C. § 902(3), a cause of action against a shipowner for injuries "caused by the negligence of a vessel," see 33 U.S.C. § 905(b). A shipowner's duty of care under the LHWCA, as delineated by the Supreme Court, includes what has been described as an "active control duty," which duty is breached when the vessel "'fails to exercise due care to avoid exposing the worker to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel.'" See Bjaranson v. Bothelho Shipping Corp., Manila, 873 F.2d 1204, 1207 (9th Cir. 1989) (quoting Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 167 (1981) ). To establish a vessel's active control over an area, a plaintiff is required to show more than "casual use of [that area] by the ship's crew for passage or activities undertaken by the crew at the specific request of stevedore personnel"; the control must be "exclusive or concurrent." See Taylor v. Moram Agencies, 739 F.2d 1384, 1387 (9th Cir.1984) (finding no active control where ship's crew merely observed stevedore's handling of cargo and ship's gear and in one instance oiled winch drum at request of stevedore personnel). The duty owed is "reasonable care under the circumstances." See Ghotra by Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050, 1060 (1997).

Turning to the case here at issue, the Court first considers whether defendant was in active control of the area in which the accident occurred. Persons coming aboard the Capella to bid on repair work were required to have an escort at all times unless given specific permission to go to an area unaccompanied. (See Cezarski Dep. 27:12-21, Jan. 18, 2012.)[5] On the date of the accident, plaintiff was not given permission to be below decks unescorted. (See id.) Rather, upon boarding the ship on that date, plaintiff was first required to check in with the Chief Engineer, Scott Agnew ("Agnew"), and, after he did so, Agnew and the Chief Mate, Peter Cezarski ("Cezarski"), escorted plaintiff to the expansion joint to perform his ship check, after which he was to be escorted back through the ship. Cezarski departed after the three men reached the expansion joint, and Agnew stayed with plaintiff while he examined it. At some point thereafter, Agnew announced that he wanted to check out the flat racks.[6] Although, as discussed below, there are differing accounts as to the exact words Agnew used at that time and as to the events that immediately followed, under any of those accounts, there can be no real dispute that the area where the accident occurred remained at all times under the control of defendant. In particular, at no time was any part of the hold or its equipment turned over to plaintiff, nor was he permitted to do anything to the ship nor to go anywhere absent an escort. Under such circumstances, the Court finds defendant was in "active control" of the area in which the accident occurred. See, e.g., Christensen v. Georgia-Pac. Corp., 279 F.3d 807, 812 (9th Cir. 2002) (holding, where ship's crew retained responsibility for checking and adjusting mooring lines, those "lines constituted equipment under the active control of the ship," even though ship had been "turned over" to stevedore company).

The Court next considers whether defendant failed to exercise due care to avoid exposing plaintiff to harm from hazards in the area under its active control. In that regard,

---

[5] Cezarski testified by videotaped deposition taken in January 2012.

[6] The expansion joint was to be removed by a crane through the cargo hold hatch. Before that removal could be accomplished, several flat racks blocking access to the hatch needed to be removed.

5

1 plaintiff testified that, after he had completed his examination of the expansion joint, Agnew
2 stated, "Let's go see how to get this thing out of here."[7]  Plaintiff further testified that he
3 followed Agnew, almost literally "on his heels," that he saw Agnew turn right at the end of
4 the stringer and then realized he had dropped his specifications for the job; he turned back
5 and found them after walking through one manway.[8]  Plaintiff then picked up the
6 specifications and continued in the direction he had seen Agnew take.  At the end of the
7 stringer, plaintiff turned to the right and saw Agnew out on one of the flat racks.  While
8 attempting to follow Agnew onto the flat rack, plaintiff fell into the gap between the flat rack
9 and the stringer.[9]  Plaintiff testified Agnew never told him to wait at the expansion joint or at
10 the railing separating the stringer from the flat racks.

11 Agnew's account differs in some respects.  Agnew testified he expected plaintiff to
12 wait at the expansion joint.  (See Agnew Dep. 81:22-25, 91:11-22, Dec. 20, 2011, vol. 1.)[10]
13 He also testified, however, that he told plaintiff he was going to the flat rack, and, consistent
14 with plaintiff's account, he has no recollection of ever telling plaintiff to wait at the expansion
15 joint.  (See id. 34:24-35:7.)  Additionally, in a statement prepared for the ship's captain on
16 the date of the accident, Agnew wrote that he "stopped on the way out to check the number
17 of flat racks that would need to be removed" (Pl.'s Ex. 5) (emphasis added), and, as noted,
18 it is undisputed that he could not leave the hold without taking plaintiff back with him.
19 Moreover, Cezarski testified that, on the day of the accident, Agnew told Cezarski that he
20 and plaintiff went to look at the flat racks to figure out the logistics of moving the expansion

---

[7] Although reported, no official transcript of the trial proceedings has been prepared.

[8] Manways are oval holes cut into steel support structures that intersect the stringer, creating a passageway from one end of the stringer to the other.  Between the two ends of the stringer traversed by plaintiff and Agnew, there were five manways, located at intervals of approximately six feet.  (See Def.'s Ex. 531.)

[9] Plaintiff testified he wanted to see the flat racks to determine if the job could be performed in a manner cheaper than that described in the request for quotes.  According to plaintiff, it was common practice for contractors to quote a different job than that specified in the request if it resulted in a more competitive bid.

[10] Agnew testified by videotaped deposition taken in December 2011.

6

joint out of the cargo hold, and that after he went out on the flat racks, he heard a noise and saw plaintiff had ducked underneath the railing, at which time it was too late to prevent him from stepping into the gap. (See Cezarski Dep. 62:12-19, 86:24-87:1, Jan. 18, 2012.)[11] Contrary to plaintiff's testimony that plaintiff was not told to wait at the railing, however, Cezarski also testified that Agnew said he had told plaintiff to "hold on a minute" at the railing. (See id.)

Having considered the evidence offered with respect to the events leading up to the accident, the Court finds Agnew told plaintiff to follow him to the flat racks. Thereafter, even if Agnew told plaintiff to wait at the railing,[12] plaintiff, apparently unbeknownst to Agnew, was no longer right behind him to hear any such instruction, and, even if plaintiff had been there, Agnew's telling plaintiff to "hold on a minute" at the railing was inadequate, given the risk of harm awaiting on the other side. Under such circumstances, the Court finds Agnew failed "to exercise due care," see Bjaranson, 873 F2d at 1207, by failing to ensure plaintiff was not exposed to the danger created by the presence of the gap. Agnew was aware that cargo holds of the type on the Capella are not areas with which contractors ordinarily are familiar (see Agnew Dep. 14:5-8, Dec. 20, 2011, vol. 2), that the area was almost totally dark, and that the gap presented a significant risk of serious injury. At a minimum, Agnew should have informed plaintiff as to the presence of the gap and also should have ensured plaintiff was with him when he conveyed that information.

Consequently, the Court finds Agnew failed to exercise due care, and, accordingly, defendant breached the "active control duty." See id.

//

---

[11] Agnew recalls yelling "No!" or "Stop!" just before plaintiff fell. Plaintiff recalls hearing Agnew yell "Watch!"

[12] The only evidence of such warning is Cezarski's testimony about what Agnew told him. Although that testimony was introduced without objection, the Court finds it less reliable than direct testimony from, or a written report prepared by, the hearsay declarant, particularly given the passage of time and because Cezarski did not include any statement about a warning in his own report of his conversation with Agnew. (See Pl.'s Ex. 8.)

## B. Plaintiff's Contributory Fault

The Court next considers the extent to which plaintiff's negligence, if any, contributed to the accident. See Davis v. Partenreederei M.S. Normannia, 657 F.2d 1048, 1051 (9th Cir. 1981) (in affirming district court, approving reduction of plaintiff's award by amount of plaintiff's negligence); see also Subingsubing v. Reardon Smith Line, Ltd., 682 F.2d 779, 780 (9th Cir. 1982) ("A negligent shipowner's liability may be reduced, but that liability is not eliminated, by the negligence of the stevedore and the longshoreworker.").

In that regard, the Court, at the outset, considers the question of whether plaintiff purposefully stepped under the rail separating the stringer from the gap or instead accidentally slipped under it. Plaintiff testified that, after he saw Agnew on the flat racks, he took a step, didn't see the gap or the rail, and the next thing he recalls was falling. Agnew, by contrast, testified that, while he was on the flat racks, he saw plaintiff duck under the rail and then stand up and take a step into the gap. (See Agnew Dep. 115:17-116:7, Dec. 20, 2011, vol. 1). The grab rail separating the gap from the stringer was 40 inches high, there is no evidence of moisture on the stringer, and plaintiff was wearing a substantial shoe with a non-slip sole on the day of the accident. In the opinion of Robert Taylor ("Taylor"), a naval architect and mechanical engineer called as an expert witness by defendant, plaintiff could not have slipped or unintentionally stepped into the gap from the safe side of the stringer as his forward movement would have been arrested by the grab rail. Having considered the evidence on the issue, the Court finds plaintiff did not slip or step into the gap from the safe side of the stringer, but, rather, purposefully ducked under the rail and stepped into the gap, being unaware of its existence.[13]

The Court next finds plaintiff acted unreasonably in failing to use his flashlight to illuminate that area. Both Agnew and plaintiff testified plaintiff was shining his flashlight up at Agnew on the flat rack rather than downward, and plaintiff testified that had he shined

---

[13] Defendant offered evidence showing plaintiff encountered a similar gap en route to the expansion joint. The Court, however, credits plaintiff's testimony that he did not see the gap because he was focusing on following Agnew.

the flashlight on the stringer or the area of the gap, he would have seen the gap.  Taylor, likewise, testified the gap was readily apparent with the use of a flashlight.  Plaintiff is an experienced marine repairman who has been working in the maritime trade since at least 1977.[14]  During his over thirty years of experience in the shipyard business, there were times when plaintiff boarded ships almost daily.  He had taught safety practices at Vigor Marine.  He knew he was unfamiliar with the hold of the Capella, having only visited the deck and engine room in the past, and he had never been in the hold of any cargo ship with the flat racks in place.  Moreover, on the day of the accident, plaintiff was reminded of the potential for danger from the unseen, as he testified it was not easy to get to the expansion joint and that he had to crawl through pipes and navigate various impediments along the way.  Under such circumstances, the Court finds plaintiff failed to exercise ordinary care when he went under the grab rail without using his flashlight to illuminate the path before him.

Accordingly, the Court finds plaintiff was contributorily negligent.  The Court further finds the appropriate apportionment of fault is 50 percent to defendant and 50 percent to plaintiff.

**II. DAMAGES**

The Court next turns to the amount of damages to which plaintiff is entitled.  Plaintiff bears the burden of introducing "sufficient facts . . . so that a court can arrive at an intelligent estimate [of damages] without speculation or conjecture."  See Harmsen v. Smith, 693 F.2d 932, 945 (9th Cir. 1982) (internal quotation and citation omitted); Navellier v. Sletten, 262 F.3d 923, 939 (9th Cir. 2001) (noting "damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery") (internal quotation and citation omitted).

    **A. Economic Damages**

        **1. Lost Past and Future Earnings**

---

[14] Plaintiff could not recall if he began working in the shipyards in 1976 or 1977.

At the outset, the Court finds plaintiff, given the nature and extent of his injuries, is unable to perform the work required by his former position.  Plaintiff testified that, following a period of recovery, he tried to return to his work at Vigor Marine, but was unable to meet the physical demands of the job.  There is no testimony or other evidence to the contrary.  Further, defendant has offered no evidence that any other employment exists for which plaintiff is qualified despite his injuries, and, given the constellation of injuries plaintiff sustained, as described below, the Court finds there is no such position available.  The Court next considers whether plaintiff would have been employed had the accident not occurred and, if so, the salary he would have received and the age at which he would have retired.

a. <u>Availability of Employment</u>

At the time of the accident, plaintiff was employed at the Alameda office of Vigor Marine.  The accident, as noted, occurred in late December 2009.  In June 2010, as a result of an economic downturn in the San Francisco Bay Area in general and in Vigor Marine's business in particular, plaintiff was laid off and the number of persons working in the Alameda office was reduced to a single, non-managerial employee.  Consequently, had the accident not occurred, it is unlikely plaintiff would have continued working at Vigor Marine in the same position he held before the accident.

Plaintiff testified, however, that given his level of experience, Vigor Marine likely would have offered him a job at one of Vigor Marine's locations in Southern California or the Pacific Northwest.  Plaintiff testified that at the time he was hired by Vigor Marine, he was told by the owner that he would always have a job with them "wherever there was work."  Plaintiff was exceptionally experienced in the maritime trades, having worked in the ship maintenance and repair business for almost 32 years by the time of his accident, and during that period had managed up to five hundred employees at a time.  Indeed, plaintiff presented evidence that, even in his injured condition, he was offered employment with two other maritime companies, but that he had to turn them down because of his physical

limitations. Plaintiff further testified that, absent his injuries, had he been presented with the choice of either moving or being unemployed, he would have moved to wherever an available job existed, despite the fact that his wife was ill and on dialysis.

The Court finds plaintiff, had he not been permanently disabled by the accident, would have been able to find employment after Vigor Marine essentially shut down its operations in Alameda. The Court further finds plaintiff, if given the choice between moving his wife and having no income with which to support her, would have relocated to a position, whether in or out of the state of California, in order to maintain employment.

### b. Compensation

Plaintiff's salary for 2009, the year of his injury, was $203,508, comprising his base pay in the amount of $115,056 ($4794 twice a month), bonuses totaling $21,142, and a lump sum incentive payment at the end of the year of $67,310. (See Def.'s Ex. 524 Ex. 1.) Defendants contend plaintiff's bonus and incentive payments should be excluded from the calculation of plaintiff's lost earnings, noting there is no evidence plaintiff would continue to receive payments of such nature in the future, particularly given the downturn in the economy. The Court notes, however, that plaintiff had earned $145,517 in 2005, $129,688 in 2006, and $215,070 in 2007, the majority of those earnings from positions with former employers.[15] (See Pl.'s Ex. 54A, Table C.) It is unlikely plaintiff would have left his former employment to take a job at Vigor Marine that paid considerably less. Irrespective of how plaintiff's earnings at Vigor Marine are characterized, the evidence supports a finding that in subsequent years, had he not been injured, plaintiff would have had the ability to command an annual salary of $159,282.[16]

---

[15] In 2005, plaintiff worked for San Francisco Dry Dock Inc. In 2006, plaintiff worked for SFDD-BAE Systems. In 2007, plaintiff earned $59,601 while working for SFDD-BAE Systems and $155,469 while working for Vigor Marine. (See Pl.'s Ex. 54A, Table C.) The record does not reflect, however, the month in which plaintiff left SFDD-BAE Systems to begin working at Vigor Marine.

[16] This figure reflects the Court's consideration of the downturn in the economy and comprises plaintiff's base salary plus fifty percent of plaintiff's 2009 bonus and incentive compensation.

1    With respect to fringe benefits, the parties' respective experts disagree as to whether Vigor Marine's contributions to Social Security and Medicare should be included in any calculation of lost earnings. Because an employee's contributions are equivalent to those made by the employer, the Court finds such contributions should not be included.[17] Contrary to the position taken by defendant's expert, however, the Court does find Vigor Marine's contribution to plaintiff's 401k retirement plan should be included. The Court thus finds plaintiff's fringe benefits for the year of the accident totaled $17,457. (See Pl.'s Ex. 54-B.)

Accordingly, the Court thus finds the total annual compensation plaintiff would have continued to earn had he not been injured is $176,739. In addition, the Court will apply to that figure an annual 2.5% cost of living increase, the percentage upon which the parties' respective experts agree. Lastly, the Court finds plaintiff's salary, exclusive of fringe benefits, was and would continue to be subject to combined federal and state income taxes at a rate of 22.7%, likewise the percentage upon which the parties' experts agree.

### c. Age of Retirement

At the time of the accident, plaintiff was 63.5 years of age.[18] Defendant, using statistics from an actuarial table based on a national average of work life expectancy for all types of employment, takes the position that plaintiff, absent his injuries, would have worked an additional 5 years, i.e., to the age of 68.7. While actuarial tables are relevant and admissible as evidence, the figures contained therein are averages and are not conclusive; rather, the Court may consider in addition a number of factors pertaining to the particular individual before the Court. See, e.g., McAsey v. U.S. Dep't of Navy, 201 F. Supp. 2d 1081, 1097 (N.D. Cal. 2002) (noting "mortality table is not conclusive evidence of

---

[17] Peter Young ("Young"), an attorney specializing in Social Security law, testified that plaintiff would have been eligible for a higher Social Security benefit if he could have continued working, and also had he deferred receiving that benefit to a later age. Young, however, had made no calculation of such additional benefit, nor did plaintiff provide any evidence from which such calculation could be made.

[18] Plaintiff's date of birth is July 7, 1946.

12

life expectancy but is one factor to consider with other relevant factors . . . such as the plaintiff's health and physical condition before he was injured, the hazards of his occupation, and his eating, drinking and smoking habits").

Here, plaintiff testified he had planned to work until the age of 75, stating that, other than the injuries he sustained in the accident, his only health issues are high cholesterol and elevated prostate readings, that working on a ship tends to keep one in good condition, and that he loved his job. Nonetheless, the work was exceptionally demanding on a physical level, requiring plaintiff to climb ship's ladders multiple times a day, and, in general, negotiate the various passageways and obstacles presented aboard a vessel. Moreover, as defendant points out, Vigor Marine closed its operations in Alameda; there is no showing plaintiff would have been able to find a position with the same responsibilities and satisfying working environment. Additionally, the record reflects other interests and endeavors in which plaintiff has engaged away from the workplace, e.g., his purchase of a ten-acre property located in rural Shasta County. Taking all of the relevant factors into account, the Court finds plaintiff would have worked an additional six and a half years, to the age of 70.

### d. Calculation of Total Past and Future Lost Earnings

Plaintiff is entitled to recover his past lost earnings incurred to date, i.e., for the period from the date of the accident to the date of judgment, and his future lost earnings, i.e., for the period thereafter to the date of retirement.[19]

In 2010, plaintiff was paid his full salary and fringe benefits for the five and a half months preceding the date he was laid off in June of that year, after which he received a severance package in the form of a lump sum payment corresponding to six months base salary, but not including the fringe benefits he would have received had his employment

---

[19] As an additional item of economic loss, plaintiff's damages expert presented an opinion as to the value of plaintiff's inability to perform household services. Plaintiff, however, presented no evidence describing the activities he once performed around the house and that he no longer is able to perform.

13

continued.  Consequently, for 2010, plaintiff's lost earnings were $3706, constituting one pay period of base salary less taxes, see Rudelson v. United States, 602 F.2d 1326, 1331 (9th Cir. 1979) (finding it "proper to deduct income taxes from the plaintiffs' awards"), together with $9456 in fringe benefits.[20]  For the period from 2011 to May 31, 2013,[21] plaintiff's lost base salary, less taxes, is $310,808, and plaintiff's lost fringe benefits are $44,067.  Plaintiff's lost earnings to date thus total $381,199.

Plaintiff's future lost earnings will be discounted at a rate of 0.4%, the rate used by defendant's expert witness.  For the period from June 1, 2013, to July 8, 2016,[22] plaintiff's lost base salary, less taxes, is $408,427, and plaintiff's lost fringe benefits are $58,062, for a total future loss of $466,489.  That figure, when discounted at the above-indicated rate is $464,623.

Accordingly, plaintiff's lost earnings, past and future combined, total $832,660.

### 2.  Medical Expenses

Plaintiff is entitled to recover as damages the reasonable cost of the medical treatment he received for injuries resulting from the accident.  As of the time of trial, Signal Mutual Indemnity Association ("Signal Mutual"), Vigor Marine's insurer, has paid $115,330.34 to various medical practitioners on plaintiff's behalf.[23]  With respect to that payment, defendant disputes the inclusion of any billings for treatment of an annular tear at L 4-5 of plaintiff's spine, a condition that was not diagnosed until after the accident.  In that regard, Edward Sun, M.D. ("Dr. Sun"), plaintiff's treating orthopedic surgeon, testified that an annular tear can be caused either by ordinary wear and tear or by trauma.  Dr. Sun

---

[20] This amount was calculated by dividing plaintiff's annual fringe benefits into 24 pay periods and multiplying by 13, the number of pay periods in which plaintiff did not receive fringe benefits.

[21] There are 10 pay periods between January 1, 2013 and May 31, 2013.

[22] There are 14 pay periods from June 1, 2013 to December 31, 2013.  There are 13 pay periods in 2016 up to the date of plaintiff's retirement.

[23] Plaintiff has incurred no out-of-pocket costs for any medical care attributable to the accident.

1  further opined, however, that even where there is an existing annular tear, if that tear is
2  asymptomatic prior to a traumatic event and thereafter becomes symptomatic, it is more
3  likely that those symptoms, and any treatment required for them, is the result of the trauma.
4  Consequently, irrespective of whether plaintiff's annular tear was initially caused by the
5  accident, the Court finds that the symptoms he thereafter experienced from that condition,
6  and the medical treatment required for those symptoms, were caused by the accident.

Accordingly, the Court finds all of the medical expenses paid on plaintiff's behalf by by Signal Mutual are attributable to the accident.[24]

### B. Non-economic Damages

Plaintiff fell a distance of sixteen feet to the bottom of the hold, striking various pipes along the way. According to plaintiff, the temperature of the hold at that point was approximately 40 degrees and it took approximately two hours for the crew to get him out, after which he was transported to the hospital, where CT scans were performed and an injury to his head was stapled closed. He sustained a separated shoulder, a torn rotator cuff, and torn ligaments in both knees as well as a torn meniscus.

Prior to the accident, plaintiff had no physical complaints. After the accident, he was treated for cervical pain, lumbar pain along with radiating pain in his legs, as well as knee and shoulder pain. He had a cervical disc removed and replaced with a bone graft and a stabilizing plate with six screws. He has undergone cervical injections and epidural injections. He had surgeries to repair the damage to both knees and surgery to repair his shoulder. He continues to have swelling in his knees and problems with his knee buckling. He has had carpal tunnel surgery, but continues to have numbness in his hand. He cannot fully extend his left arm, and discomfort in his arm interferes with his ability to sleep. He cannot sit for more than twenty minutes at a computer before he needs to stand and move

---

[24] Although Dr. Sun also testified plaintiff may need surgery at L 4-5 if his lumber pain continues, there is no evidence before the Court as to the cost of any such surgery.

15

about, with each successive tolerable period thereafter becoming shorter.[25]

Although he states he tries to lead a normal life, plaintiff cannot return to the work he previously enjoyed. Because of the cervical fusion, Dr. Sun has restricted him from engaging in the types of physical activity required by that work, and, in any event, as a practical matter, he likely would be precluded by the pain he experiences following extended physical activity, both standing and sitting.

During closing argument, plaintiff's counsel suggested an award for pain and suffering in the amount of $800,000. Given the testimony by plaintiff and his doctor regarding the nature and extent of plaintiff's injuries, the pain plaintiff had and continues to suffer as a result of those injuries, and the manner in which plaintiff's ability to work and engage in other activities has been affected, the Court finds the amount requested to be reasonable and appropriate.

### C. Total Damages

Accordingly, the Court finds plaintiff's total damages, including lost past and future earnings, medical expenses, and pain and suffering are $1,747,990. Because, as noted, the Court finds plaintiff was contributorily negligent and assigns to each party fifty percent responsibility for plaintiff's injuries, plaintiff is entitled to an award in the amount of $873,995.

### III. Pre-and Post-Judgment Interest

As this case is governed by the PVA, plaintiff is not entitled to pre-judgment interest, see 46 U.S.C. § 31107, but is entitled to post-judgment interest at the rate provided by the Suits in Admiralty Act ("SIAA"), see 46 U.S.C. § 31103 (providing "civil action under the [PVA] is subject to the provisions of the [SIAA] except to the extent inconsistent with [PVA]"); 46 U.S.C. § 30911 (providing "judgment against the United States . . . under [SIAA] may include costs and interest at the rate of 4 percent per year until satisfied").

---

[25] At the outset of the trial plaintiff sought the Court's permission to stand at regular intervals, and, on occasion, left the courtroom in order to move about without disrupting the proceedings.

## CONCLUSION

For the reasons stated above, plaintiff is entitled to judgment in the amount of $873,995, together with post-judgment interest at the rate of 4 percent per annum until said judgment is satisfied.

The Clerk shall enter judgment in accordance with the above findings.

**IT IS SO ORDERED.**

Dated:  May 31, 2013

MAXINE M. CHESNEY
United States District Judge